UNITED STATES of America,
Plaintiff–Appellee,

v.

Kevin B. STOUT, Defendant–Appellant.

No. 91–1679.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 6, 1991.

Decided June 4, 1992.

Rodger A. Heaton, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Springfield, Ill., for plaintiff-appellee.

Mitchell K. Shick (argued) and David Y. Eberspacher, Heller, Holmes, Hefner & Eberspacher, Mattoon, Ill., for defendant-appellant.

Before BAUER, Chief Judge, EASTERBROOK, and KANNE, Circuit Judges.

BAUER, Chief Judge.

If, as a society, one of the criterion by which we are judged is how we treat our elderly, we can only hope that the facts of this case will be viewed as the exception rather than the norm. Defendant-appellant Kevin B. Stout appeals from his conviction on four counts of mail fraud relating to the sale of life insurance policies to three women in their seventies and eighties. From our opening sentence, it should come as no surprise that we affirm.

## I.

In 1986 and 1987, Stout, a state licensed insurance agent, sold insurance through Randy Coonce & Associates, an insurance agency in Charleston, Illinois. The agency's president, Randy Coonce, purchased referral, or lead cards from the National Association of Retired Persons ("NARP"). The cards contained the names, addresses, and phone numbers of NARP members interested in financial investments that would provide a certain return. Stout obtained a number of the cards and then contacted the persons named thereon with the intent to sell them a universal life insurance policy offered by Inter–State Assurance Company ("IAC"), called the Flexlife II.

Flexlife II, like all basic life insurance policies, paid a benefit to the named beneficiary on the death of the insured, and accumulated a cash value based on the premiums paid and the insurance in force. In addition, assuming that a certain ratio were maintained between the cash value of the policy and the death benefit that it provided, Flexlife II offered several tax benefits for policyholders. These benefits included deferral of income tax on the 9.5 percent interest earned on the cash value of the policy, the ability to borrow against the cash value of the policy tax-free, the ability to withdraw cash from the policy's cash value on a first in, first out basis, and a tax-free death benefit to the beneficiary. Although the IAC policy offered certain investment aspects, IAC never authorized it for sale as a pure investment program.

For persons up to eighty-five years, IAC required a physical examination before it would issue a Flexlife II policy. But, the higher the age of the insured, the higher the cost of the insurance, and the lower the return on the investment features of the policy. Further, the older the insured, the longer it would take for the policy to reach the "break-even" point. This is the point at which the cash value of the policy is equal to the amount of premiums paid. Indeed, for the more elderly insured the policy would never break-even because the high cost of the insurance exceeded the portion of the premium left to accrue interest.

Stout was successful in selling the IAC policy to approximately 30 people, the majority of whom were fifty-five years old and older. He admitted that he targeted senior citizens, claiming they were more readily available during daytime hours. To service younger customers employed during the daytime, Stout would have to work evening hours. Among the persons Stout sold IAC policies to were Theo Bridges, Zola Wolfe, and Gladys Robinson. When IAC issued the policies, it sent them their copies through the United States mail.

Theo Bridges, seventy-eight at the time of trial, is a retired school teacher. In response to a mailing from the NARP, she returned one of the lead cards requesting more information about investment programs that offer tax benefits. That card found its way to Stout, who found his way to Bridges's house in March of 1987. He told Bridges he was selling an investment. Stout described a program under which Bridges could earn 9 percent interest tax-free, and that would allow her to withdraw her money at any time. As she remembered it, Stout did not mention insurance at all; moreover, she did not want, or need, any life insurance. Bridges filled out an application, which she thought was the required paperwork for this investment, and gave Stout $1000 to get started.

Stout forwarded the application to IAC, who denied coverage. Undaunted, Stout contacted Bridges to inform her that although she did not personally qualify, she could still invest her money in an IAC policy on her daughter. Bridges agreed, and her initial $1000 payment to Stout went toward the policy on her daughter. Of that amount, Stout received $500 as his commission. At the end of the first year Bridges owned it, this policy had a cash value of $437.

In October 1987, Bridges contacted Stout when a certificate of deposit she owned matured. She wanted to add the money, $16,500, to her investment with IAC. Instead of purchasing more insurance from IAC, however, Stout used Bridges's money to purchase a policy from Pioneer Life Insurance Company. Bridges neither completed an application for this policy, nor did she authorize Stout to do so. He did it nonetheless, using information he obtained from Bridges for the IAC policy. He had no personal information on her daughter, so he filled out the form with incorrect data. Then he forged both of their signatures, disguising his handwriting, and signed the application as a witness to the signatures of the two women.

Stout explained at trial that he decided to use Bridges's money to purchase the Pioneer policy rather than the IAC because he feared Randy Coonce would not forward the $16,500 to IAC. He admitted, however, that his commission from Pioneer was greater than what he would have received from IAC. He also admitted he never informed Bridges of his unilateral decision to use her money to buy the Pioneer policy.

In April 1987, Zola Wolfe, an eighty-five year old retired school teacher, also received a house call from Stout. He told her he sold life insurance and was interested in selling her a policy. She responded that she did not need or want any insurance. She could not recall discussing investments with Stout. Nonetheless, Stout came away from this meeting with Wolfe's signature on an application for Flexlife II insurance, which called for an annual premium of $4000. When IAC denied coverage, Stout, without authorization from Wolfe, submitted an application for a policy on Wolfe's daughter. Once again, Stout filled in incorrect information for the in-

sured, Wolfe's daughter, and forged both women's signatures on the application.

Gladys Robinson, an eighty-three year old retired office worker, also filled out one of the NARP lead cards. Stout visited her in September 1987. He offered to sell her a tax-free investment that offered a 9.5 percent return. Having her interest piqued, Robinson gave Stout a check for $1000 for this investment. Stout said nothing to her during this meeting about life insurance. (If he had, he would have learned Robinson neither wanted nor needed any life insurance.) Stout, however, did ask her some questions involving her health that she believed were related to the investment opportunity. A month later, Robinson gave Stout an additional $4000 for this investment. For her $5000, Robinson purchased $41,916 worth of life insurance that after a year would have a cash value of only $654. Because of her age, her policy would never reach the break-even point.

In time, the Illinois State Police began investigating the fraudulent sales of insurance policies by Randy Coonce & Associates insurance agency. In April 1988, Ned A. Bandy, then an investigator with the Fraud and Forgery Division, interviewed Stout. Other interviews with law enforcement agents followed. During those interviews Stout admitted that he believed some of his customers, specifically Bridges, Wolfe, and Robinson, did not understand that they were buying insurance. (At trial, however, he testified that he believed they all understood they were buying insurance.) He admitted to the agents that he forged Bridges's and her daughter's signatures, and that he knew he should not have bought the Pioneer policy with her money without talking to her about it.

One result of this investigation was that Bridges, Wolfe, and Robinson all got their money back from IAC. Another result was that a federal grand jury sitting in Danville, Illinois, indicted Stout on four counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342, for his fraudulent conduct in the sale of insurance policies to seven individuals. Subsequently, a seven-count superseding indictment issued. Prior to trial, the government voluntarily dismissed counts three and six. The matter was tried without a jury. The testimony of two of the elderly witnesses, Wolfe and Robinson, was presented by way of videotaped evidence depositions. At the trial's conclusion, the trial judge found Stout not guilty on count seven, but guilty on counts one (Bridges), two (Bridges), four (Wolfe), and five (Robinson). After a hearing, the judge sentenced Stout to ten months imprisonment on counts one, two, and four, and twenty-four months probation on count five, to run consecutive to his prison term. As a condition of probation, the judge ordered Stout to pay $984 restitution to the Pioneer Life Insurance Company. Additionally, Stout was ordered to pay a special assessment of $200. Stout filed a timely notice of appeal to this court.

II.

 Stout's opening challenge is to the trial judge's denial of two pretrial motions. The first, denial of his motion for discovery or *in camera* inspection of the grand jury proceedings, we can dispose of summarily. The essence of his argument is that the prosecutor failed to present exculpatory evidence to the grand jury, which he claims was a violation of his right to due process. He contends that the prosecutor's misconduct would have been apparent after an *in camera* review, and, as a result, the district judge should have invoked his supervisory powers to dismiss the indictment. Last month, however, the Supreme Court definitively resolved this issue. Presented with a similar argument, the Court stated that "[b]ecause the grand jury is an institution separate from the courts, over whose functioning the courts do not preside, we think it clear that, as a general matter at least, no such 'supervisory' judicial authority exists...." *United States v. Williams*, — U.S. —, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992). More importantly, the Court held that a prosecutor has no duty to present exculpatory evidence to the grand jury. "[R]equiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's his-

torical role, transforming it from an accusatory to an adjudicatory body." *Id.* at 1744. Stout's argument, therefore, fails.

 Stout next contends that the district judge erroneously denied his motion to dismiss the indictment, claiming it is internally inconsistent and insufficient as a matter of law. An indictment is constitutionally sufficient if it states all of the elements of the offense charged, informs the defendant of the nature of the charges so that he can prepare a defense, and enables the defendant to assess any double jeopardy problems the charge may raise. *United States v. Sloan*, 939 F.2d 499, 501 (7th Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 110 (1992). The elements of mail fraud are a scheme to defraud and use of the mail in furtherance of that scheme. *United States v. Biesiadecki*, 933 F.2d 539, 545 (7th Cir.1991). With all of that in mind, we consider the indictment as a whole to determine if it meets the requirements above. *United States v. McNeese*, 901 F.2d 585, 602 (7th Cir.1990). And when, as here, the charge is mail fraud, we use a broad rather than a technical standard to determine the sufficiency of the allegation. *United States v. Brack*, 747 F.2d 1142, 1147 (7th Cir.1984), *cert. denied,* 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985).

 Counts one and two charge Stout with mail fraud in connection with the sale of the $1000 IAC policy to Theo Bridges and the $16,500 Pioneer Life policy he purchased without her authorization. He claims that these counts are internally inconsistent in that each alleges in paragraph 1(A)(2)(a) that he failed to inform Bridges that the product he offered for sale was an insurance policy while at the same time alleging in paragraph 1(A)(2)(c) that he falsely represented that life insurance was a side benefit and qualifier for the investment program. Stout misses the intervening allegation, which bridges the logical gap. Paragraph 1(A)(2)(b) alleges that Stout falsely represented that the product offered and sold was an investment program. Taken as a whole and in a logical sequence, these allegations inform Stout

that the conduct for which he was charged was his failure to tell Bridges he was selling insurance, telling her instead he was selling an investment program, and to qualify for that program she necessarily would have to apply for, and ultimately receive, certain life insurance benefits. We see no inconsistency in these allegations.

Next, Stout argues that count four contradicts the government's general scheme contained in the remaining substantive counts. Count four alleges a scheme to defraud Zola Wolfe by representing to her that the $1400 she gave him was for an insurance policy on her life when in fact he used the money to purchase a policy that named her daughter as the insured. Stout claims that the general scheme alleged in the indictment is that he failed to inform the insureds they were purchasing life insurance. Stout, however, misstates the general scheme alleged, described in Section B of the indictment and appropriately entitled "Scheme to Defraud." There, the government alleges a general scheme "to defraud senior citizens and to obtain money and property by false and fraudulent pretenses." Indictment at 2, Record Document 1 ("Indictment"). Section B explains that as a part of that scheme, Stout "offered, solicited, and sold insurance policies to senior citizens," including Wolfe. *Id.* It concludes that, in furtherance of the scheme, Stout made the material omissions and misrepresentations set out in the substantive counts, knowing those omissions and misrepresentations to be false. *Id.*

Stout's view of the indictment is that it alleges a scheme to defraud by failing to inform named senior citizens that he was selling insurance, representing instead that he was selling them an investment. Counts one, two, and five do make that precise allegation. But Stout's interpretation of the indictment is too narrow. The scheme alleged is one to defraud seniors and obtain money by false pretenses. Count four is consistent with that allegation—it alleges he defrauded Wolfe by telling her she was buying an insurance policy on own life when in fact he sold her a policy on her daughter's life.

Finally, Stout argues that the allegations in count five demonstrate the government's misunderstanding of universal life insurance because it alleges that he falsely represented to Gladys Robinson that the product offered and sold was an investment program and estate liquidity plan. He interprets that to mean that the falsehood went to the benefits offered by the Flexlife II policy. Stout urges that some of Flexlife II's more attractive features include its investment aspects and interest-earning potential. Again, Stout misreads the indictment. Count five does not allege that Flexlife does not offer an investment program and estate liquidity plan. It alleges that Stout failed to inform Robinson that he was selling insurance, and instead represented that he was selling an investment program and estate liquidity plan.

We have looked at the indictment as a whole, as our cases require. It meets the requirements of *Sloan*, and consequently, the Constitution. There was no error in the district judge's denial of Stout's motion to dismiss the indictment.

### III.

◼ In the first of Stout's challenges to his conviction, he argues that the trial judge constructively amended the indictment in that his findings, conclusions, and verdict were based on an offense not charged in the indictment, which denied him due process. A constructive amendment results when "the offense proved at trial was not fully contained in the indictment, for trial evidence had 'amended' the indictment by *broadening* the possible bases for conviction from that which appeared in the indictment." *United States v. Kuna*, 760 F.2d 813, 817–18 (7th Cir.1985) (quoting *United States v. Miller*, 471 U.S. 130, 138, 105 S.Ct. 1811, 1816, 85 L.Ed.2d 99 (1985) (emphasis original)).

◼ Stout raises several contentions. First, he claims that although count four alleged that he took money from Wolfe and "falsely represented that the money would be used for an insurance policy," Indictment at 5, there was no evidence offered to support that allegation. Indeed, he contin-

ues, the trial judge made no findings consistent with count four's allegations, finding instead that Wolfe was "adamant in [her] testimony that [she] didn't want to buy any insurance and that [she] told that to the Defendant," Findings, Conclusions and Verdict at 2, Record Document 22 ("Findings"). This finding, he claims, constructively amended the charge for which he was convicted to failure to explain the product sufficiently.

Stout's representation of the allegation in count four stops short and his representation of the evidence at trial misses the mark completely. Count four alleges that he falsely represented that the money Wolfe gave him would be used on an insurance policy insuring her life when in fact he used it to purchase a policy insuring her daughter's life. Wolfe testified that she didn't want any insurance, as the trial judge found. Wolfe Evidence Deposition ("Wolfe Dep.") at 10, 12. But she also testified that she couldn't remember whether Stout said he was selling an investment. *Id.* at 13. In spite of not wanting to buy insurance, she did fill out and sign an application for insurance on her life when Stout visited her in April 1987. Government's Exhibit ("Ex.") 8. Stout believed she knew that he was selling her an insurance policy. Trial Transcript ("Tr.") at 468–70. He discussed the premium payment with her. Tr. 470. She gave him money as a down payment on that policy. Tr. 465. When IAC denied that policy, instead of returning her money, he submitted an application in her name for a policy on her daughter's life. Ex. 9. Both Wolfe and her daughter testified that the signatures on that application purporting to be theirs were not. Wolfe Dep. 16–17; Tr. 227–28. Clearly, based on the evidence offered at trial, Stout's conviction on count four was not broadened to include conduct for which he was not charged.

◼ He also claims that the trial judge constructively amended counts one, two, and five, which allege that Stout failed to inform Bridges and Robinson that the product he was selling was life insurance. The judge concluded "from the evidence that

Defendant deliberately played down the fact that he was selling an insurance policy, if in fact he ever revealed it." Findings at 2. This finding, he argues, enlarged the indictment from the charge of failure to inform these women he was selling insurance to merely playing down that fact. Again, Stout stops short. The very next sentence contains the judge's finding that Stout "made material misrepresentations and omissions in his presentation to his customers and that he did so knowingly and with the specific intent to cause the customers to pay him money from which he would derive a financial gain." *Id.* The evidence supporting this conclusion regarding counts one and two includes Bridges's testimony that she had no recollection that Stout ever said anything about insurance in connection with the investment program he sold her. Tr. 177. Regarding count five, Robinson testified that Stout said nothing about insurance during his sales presentation for the investment program. Robinson Evidence Deposition ("Robinson Dep.") at 10–11, 19. The judge's finding, therefore, was not a constructive amendment.

■ Stout's last contention is that the judge's finding that his "failure to inform his customers about the cost associated with the policy and the requirement of additional investment to reach even a break even point during life were material omissions that constituted fraudulent misrepresentations" (Findings at 3), again constructively amended the indictment to charge him with failure to inform customers of the break-even point. Not so. The indictment charges a scheme to defraud named persons out of money to which Stout was not entitled. Clearly, a person who believed she was purchasing an investment program needs to be informed about its cost and additional amounts necessary to reach the point where the investment will begin to show a return. Understood in that context, this finding goes to the general scheme to defraud in that Stout made material omissions that constituted fraudulent misrepresentation. Indeed, the judge stated, "The testimony of the customers convinces the court without doubt that they believed they

were making a one time investment and not buying into an annual liability." *Id.* at 2.

## IV.

■ Finally, Stout challenges the sufficiency of the evidence to support the trial judge's findings and guilty verdict, denoting multiple findings he claims are clearly erroneous. Because the district court heard the witnesses' testimony first hand and observed their demeanor, our review is highly deferential. We view the evidence in the light most favorable to the government, and if any rational trier of fact could have found, beyond a reasonable doubt, the elements of the crime charged, we affirm the conviction. *United States v. Mokol,* 957 F.2d 1410 (7th Cir.1992).

As noted earlier, the elements of mail fraud are a scheme to defraud and use of the mail in furtherance of that scheme. *Biesiadecki,* 933 F.2d at 545. Stout does not challenge the sufficiency of the evidence that establishes the mailing element. He asserts instead that his conviction is based on the incorrect premise that evidence of a failure to disclose information to his customers satisfies the scheme-to-defraud element in a mail fraud case. In support, he cites *Reynolds v. East Dyer Development Co.,* 882 F.2d 1249, 1252 (7th Cir.1989). In that case, however, the defendants made no affirmative misrepresentations about the object of the fraud alleged, they simply failed to disclose information. *Id.* Assuming there was sufficient evidence here, which we discuss below, Stout's conviction is based on his affirmative misrepresentation to Bridges and Robinson that he was selling them an investment, and to Wolfe that he was selling her an insurance policy on her life. *Reynolds,* then, is inapplicable.

Count one describes Stout's scheme to defraud Bridges by failing to tell her that her $1000 would be used to purchase an IAC insurance policy and falsely representing it was going to an investment program. The allegations continue that he falsely told Bridges that insurance was a qualifier and side-benefit of the investment program, that the money deposited into the

program would earn 9 percent interest, that her money could be withdrawn at any time, and that he failed to inform her she would have to make annual premium payments. When that policy was declined, Stout sold her an IAC policy on her daughter's life, making the same omissions and false representations. Indictment at 2–3. In support of these allegations, the government offered Bridges's testimony that she had no recollection of discussing insurance with Stout, that the $1000 she gave him was for an investment. Tr. 177, 180. Stout told her this investment would earn 9 percent interest, there would be no tax on it, and she could withdraw her money at any time. Tr. 177. Stout testified that after she was declined, he told her that the insurance amount could cover a family member and she could still enjoy the tax advantages. Tr. 437. She agreed. An IAC executive testified that after a year, however, Bridges's $1000 "investment" was worth only $437. Tr. 51. She could not, therefore, withdraw all the money she invested at any time, nor had the money earned the promised 9 percent interest. Stout earned $500 as a commission on this sale. Tr. 494.

Count two makes many of the same allegations as count one, except that it addresses the $16,500 Bridges gave Stout. It further alleges that Stout, without the knowledge or authorization of Bridges or her daughter, forged their signatures on an application for Pioneer Life Insurance. Indictment at 3–4. Here, Bridges testified she gave Stout $16,500 as an additional investment into the program for which she gave him the $1000. Tr. 185. Neither she nor her daughter had any knowledge of the Pioneer application, neither having authorized nor signed it. Tr. 184, 217. Stout, on the other hand, admitted that he forged those signatures, disguising his handwriting. Tr. 450–51, 500. In an interview with law enforcement agents, Stout said he didn't think Bridges knew what she was buying. Tr. 128–29. His embarrassment at what he had done prevented him from telling Bridges that he submitted a forged application for her with Pioneer. Tr. 124–25. On this sale, Stout stood to earn $820

as a commission and $164 as a bonus. Tr. 87, 510–11.

The scheme to defraud in count four details Stout's sale of life insurance to Wolfe for $1400. Coverage on her life was denied. Stout then forged her signature, and her daughter's, on an application for insurance on the daughter's life, without the knowledge or authorization of either woman. He received a commission for the sale of this policy. Indictment at 4–5. In this regard, the government offered its Exhibit 8, which was a copy of Wolfe's initial application for insurance, requiring $1400 annual premiums. Wolfe verified her signature on it. Wolfe Dep. 14. The government offered the second application, Exhibit 9, and Stout admitted that he prepared it, and signed Wolfe's daughter's name without authorization. Tr. 467–69, 514. Wolfe had no memory of discussing the second application with Stout, and said she would not have authorized him to sign her name on an application for insurance for her daughter. Wolfe Dep. 15–17. The daughter also testified that she did not authorize Stout to sign her name, nor fill in her medical history, which he did incorrectly. Tr. 227–29. As with the other policies, Stout stood to earn a commission if IAC granted the daughter insurance coverage.

The sale of an IAC policy to Robinson for $5000 is the scheme described in count 5. The allegations here include that Stout failed to inform Robinson that he was selling her life insurance, that he falsely represented his product was an investment program and estate liquidity plan, that it would earn 9 percent interest, that she would receive periodic interest checks, and that no further payments would be required, failing to inform her that the insurance policy in fact required the payment of annual premiums. Indictment at 6. The evidence showed that Stout told Robinson he was offering a tax-free investment that would earn 9.5 percent interest. Robinson Dep. 10. Stout never discussed insurance regarding this investment. *Id.* at 10–11, 19. Robinson told him that she wanted to invest $5000 on a one-time basis, and gave him two checks totalling $5000 to that end. *Id.* at 13, 15; Government's Ex. 10. Although the IAC policy provided that the

policyholder could make lump sum premiums, Stout did not indicate this payment method on the application. Government's Ex. 11. An IAC executive testified that after one year, Robinson's $5000 investment was worth $654, and because of her age, would never reach the point where the cash value would equal the premiums paid. Tr. 53. And again, Stout earned a commission.

In his findings, the district judge found the victims credible; indeed, they recouped their investments and therefore had no motivation to lie. He noted that Stout admitted forging some of the victims' signatures, diverting Bridges's $16,500, and said he believed that these women did not know what they were buying. Beyond those admissions, the judge found Stout incredible, and the witnesses defendant offered did not dissuade him. These findings are entirely consistent with the evidence. We conclude, therefore, based on the evidence presented at trial, that any rational trier of fact could have found Stout guilty of mail fraud beyond a reasonable doubt.

## V.

For the foregoing reasons, Kevin B. Stout's conviction for mail fraud is

AFFIRMED.