In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-3403 & 09-3684

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

MICHAEL SEGAL,

*Defendant-Appellant/*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:02-cr-00112—**Ruben Castillo,** *Judge.*

ARGUED JANUARY 13, 2011—DECIDED MAY 3, 2011

Before RIPPLE, EVANS ,and SYKES, *Circuit Judges.*

EVANS, *Circuit Judge.* Michael Segal is here again—for the third time. He was originally indicted in 2002. The indictment was superseded several times, with a fourth version returned in 2004. In its fourth reincarnation, the indictment charged Segal and his company, Near North Insurance Brokerage (NNIB), with a bevy of counts in-

cluding racketeering, mail and wire fraud, embezzlement, false statements, and conspiracy to impede the Internal Revenue Service.

Following a trial, a jury found Segal guilty on all charged counts except one that the government dismissed during the trial. Subsequently, during post-trial proceedings, the district court knocked out seven counts. At the end of the day, 19 counts were left standing. NNIB was also convicted. Segal was sentenced to serve a 121-month term, pay $841,527.96 in restitution, and forfeit $30 million plus his interest in the racketeering enterprise (i.e., NNIB). Segal and NNIB appealed.

Before the appeal was heard, we resolved a somewhat-related appeal filed by Segal growing out of an action by a trustee appointed by the court to manage the affairs of NNIB and a related entity. Segal came out on the short end of that appeal. *See United States v. Segal*, 432 F.3d 767 (7th Cir. 2005). Segal fared marginally better on his appeal from the criminal trial: we affirmed his conviction, but remanded the case to the district court for further proceedings regarding the forfeiture issue. *See United States v. Segal*, 495 F.3d 826 (7th Cir. 2007).

Back in the district court, the forfeiture was cut to $15 million. Both sides were unhappy. Both appealed. The government claimed the amount should have stayed at $30 million; Segal claimed $1.5 million ("at the most") was the right figure. Before the new appeal was resolved, Segal received what we suspect he must have viewed as a ticket to a do-over of the whole shebang—the Supreme Court issued its opinion in *Skilling v. United States*, 130

S. Ct. 2896 (2010). Why is that? Well, the alleged scheme that ran though the indictment against him claimed that Segal was involved in money/property fraud along with fraud involving the deprivation of his "honest services." In *Skilling*, the Supreme Court trimmed the theory of honest services fraud so it only applies to a defendant involved in either bribery or a kickback scheme. We asked the parties to submit supplemental briefs regarding *Skilling* and they have done so.

The evidence fails to suggest that Segal was involved in either bribery or a kickback scheme. So the instructions given to the jury regarding honest services fraud were wrong. However, *Skilling* holds that an error such as occurred here does not require the reversal of a conviction if it is shown to be harmless beyond a reasonable doubt. This is so because a general verdict may be supported by an alternative, and valid, legal theory such as money/property fraud alleged in the indictment against Segal. That's the route we followed in affirming, in part, the conviction of the defendant in *United States v. Black*, 625 F.3d. 386 (7th Cir. 2010).

So the issue here boils down to this: would the jury have still convicted Segal had it not been told that in addition to the valid money/property fraud allegations, an allegation of honest services fraud could also be taken into consideration? We conclude that the jury would—and most certainly did—convict Segal for money/property fraud, irrespective of the honest services charge. This is because even if the jury concluded that there was an honest services violation, that viola-

tion had to be premised on money/property fraud. That is, to the extent Segal was depriving others of his honest services, it was because he was taking their money.

NNIB was required to use a premium fund trust account (PFTA) to hold, as a fiduciary, premium deposits from insureds. The deposits were supposed to sit in the PFTA until it came time to pay the carriers. The government charged and presented evidence of a fraudulent scheme whereby Segal took the money deposited in the PFTA and used it to expand his business by purchasing and investing in other insurance brokerages and companies.

The jury was instructed that the mail and wire fraud counts required that the government prove either a scheme to 1) defraud, 2) obtain money, or 3) deprive others of "honest services in the operation of Near North Insurance Brokerage *and* the maintenance of Near North Insurance Brokerage's Premium Fund Trust Account" (emphasis added). Accordingly, any honest services violation had to be based on the PFTA. This requirement was repeated in the jury instructions' explanation of a "scheme" and a "scheme to defraud another of a right to honest services."

If the jury convicted Segal of honest services fraud for failing to maintain the PFTA, it raises the question *how* did Segal fail to maintain the PFTA? Under the evidence presented, there is one overwhelming answer. He failed to maintain the PFTA by taking out the funds that were supposed to go the insurance carriers. That is, Segal fraudulently represented to the insureds and insur-

ance carriers that he would hold the insurance premiums in trust, but instead took the money on a shopping spree—at one point the PFTA was short $30 million. This is monetary fraud. If the jury found an honest services violation, it was only because of this underlying fraud. The jury could not have found Segal guilty for failing to maintain the funds in trust without concluding that Segal *was taking the money*.

So that leaves us with two possible conclusions, neither of which help Segal. The jury convicted Segal based on an honest services theory which, under the evidence presented, required that the jury conclude that Segal was guilty of monetary fraud. Or the jury dumped the honest services theory and simply relied on monetary fraud. Either way, a conviction for monetary fraud is left standing.

Segal's arguments to the contrary get him nowhere. First, he argues there was no victim. But that is not correct, the jury instructions specifically name "insurance carriers and/or customers" as the victims. Nor does it matter, as Segal appears to contend, if the victim suffered no loss. Loss is not required to prove fraud, whether monetary or otherwise. *See United States v. Sorich*, 523 F.3d 702, 709-10, 712-13 (7th Cir. 2008); *United States v. Hamilton*, 499 F.3d 734, 736-37 (7th Cir. 2007).

Segal also argues that in *Neder v. United States*, 527 U.S. 1 (1999), the Supreme Court held that "defraud," as used in the mail and wire fraud statutes, means fraud as it was understood at common law, and here the elements of common law fraud were not met. But *Neder* focused on

and reached a conclusion as to only one element of fraud at common law: materiality. *Neder*, 527 U.S. at 22-25 ("we hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes"). *Neder* was silent, for instance, on intent to cause harm. Regardless, Segal would have us construe *Neder* as requiring a specific intent to cause injury. We reject this request. Not only because *Neder* does not contain any such holding, but because we have already held that this is not the case. *See Hamilton*, 499 F.3d at 736 (if you obtain money by fraud "you are not excused just because you had an honest intention of replacing the money"); *United States v. Davuluri*, 239 F.3d 902, 906 (7th Cir. 2001) ("Exposing the victim to a substantial risk of loss of which the victim is unaware can satisfy the intent requirement. That Davuluri sincerely intended his scheme to generate a profit is irrelevant") (citations omitted). We decline to read into *Neder* conclusions it did not reach.

Contrary to Segal's assertion that this case was presented as one primarily resting on an honest services violation, the case, and the government's presentation, were about the money. Even the government noted when discussing honest services during its closing argument that the honest services violation was premised on Segal's taking money. The term "honest services" does not appear in Segal's closing argument and is mentioned only once in the government's rebuttal. Segal's attempt to equate the government's references to "fiduciary" in its closing as equivalent to mentioning "honest services" fails. They are not the same thing and even

Segal's counsel admitted at argument that he was unsure how "fiduciary" was used in the context of "fiduciary fraud." The parties just didn't emphasize honest services during the trial as strongly as Segal now contends.

In sum, Segal's convictions stand. Even so, re-sentencing is required because the district court may have thought that Segal committed honest services fraud *and* money and property fraud, and increased the sentence accordingly. *Black*, 625 F.3d at 388-89.

But we still have the issue of the $15 million forfeiture order—the only issue at play until *Skilling* arrived on the scene. As we noted earlier, both sides argue the district court got it wrong. We disagree.

We remanded the case to the district court in 2007 to determine if there was any double-counting when Segal was forced to forfeit his enterprise and $30 million—some of which Segal may have reinvested in his enterprise. We asked the district court to determine what part of the $30 million was not reinvested in the enterprise, but rather went to benefit Segal personally and should therefore be subject to forfeiture. This is a question of fact. Therefore, we review the court's decision on remand only for clear error. *United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005).

Not surprisingly, Segal did not leave detailed records of his crimes. As originally noted by the district court back in 2004, Segal's "lackluster accounting system, which was a deliberate attempt to conceal his fraudulent conduct, preclude[s] such a detailed accounting." *United States v. Segal*, 339 F. Supp. 2d 1039, 1049 (N.D.Ill. 2004). On

remand, the district court did exactly what we asked of it. Using the evidence that was available, it cogently explained the amount of money that Segal took for personal use. None of the shortcomings alleged by the government or Segal rise to the level of clear error. Setting a restitution figure in a case like this is akin to hitting a zone rather than a point. The zone the district court ended up in seems eminently reasonable to us.

We REMAND this case to the district court so that the court can consider resentencing Segal in the event that any honest services conviction affected his sentence. Of course, if the court would have imposed the same sentence irrespective of any honest services fraud, no resentencing is necessary. The judgment of the district court is otherwise AFFIRMED.