# In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-1380 & 11-1394

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AARON DEL VALLE AND ALFRED SANCHEZ,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 CR 149—**Robert W. Gettleman**, *Judge.*

ARGUED FEBRUARY 21, 2012—DECIDED MARCH 20, 2012

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge,* and SHADID, *District Judge.*[*]

SHADID, *District Judge.* Following a jury trial, Alfred Sanchez was convicted of one count of mail fraud in violation of 18 U.S.C. § 1341 and his co-defendant

---

[*] The Honorable James E. Shadid, United States District Court, Central District of Illinois, sitting by designation

Aaron Del Valle was convicted of one count of perjury. Sanchez appeals contending that the erroneous admission of certain evidence was not harmless error and that city jobs are not "money or property" for purposes of 18 U.S.C. § 1341. Del Valle appeals contending the district court erred when it repeatedly denied his motions for severance.

## I. BACKGROUND

Alfred Sanchez rose through the ranks of Chicago politics eventually becoming Commissioner of the Department of Streets and Sanitation ("Department"). Sanchez was also one of the founders and leaders of the Hispanic Democratic Organization ("HDO"), a campaign organization staffed largely by City employees and those seeking employment with the City. Sanchez acted in a dual role as a City official and political operative and participated in a scheme to award City jobs to individuals who participated in campaign work. This was in direct violation of a series of orders and consent decrees entered into known as the *Shakman* decrees.

The *Shakman* decrees enjoined the City from patronage hiring practices for most positions. To implement the policy, the City instituted a multi-step hiring procedure. In the first step, the City approved the expenditures of money from its budget to fill vacant positions. In the next step, the City issued public notices that it was accepting applications. The notices were posted in City Hall and public libraries throughout the city identifying the open positions, the minimum qualifications for the job and the wage paid by the City for the position.

Applications were to be screened by City employees to determine which of the applicants were eligible for the jobs based on the required qualifications for each posting. Once an applicant was deemed qualified, the applicant was placed on a list to be interviewed. The interview process was designed to evaluate candidates based on specific criteria, without reference to their respective political affiliation.

Candidates were evaluated and scored numerically on a scale of 1 to 5 against specific criteria, e.g., quality of previous experience, oral communication skills, etc., and the final score was derived from a process of multiplying scores in a particular category by the weight assigned to that category. Accordingly, the candidates with the highest scores received the jobs. The last stage in the hiring process involved the "official hiring authority" for each department to certify that political considerations did not enter into the hiring decisions.

The Mayor's Office of Intergovernmental Affairs ("IGA"), served as the City's lobbyist to the City Council and other governments. Though it had no official role in hiring or promotion of City jobs, the IGA received lists of vacancies from personnel officers within the City's various departments and indicated preferred candidates, who then received interviews and jobs. The IGA also formed organizations of City employees to perform campaign work, directed political organizations to support selected candidates, and used the organizations to work precincts for candidates during elections. As compensation for their work, these organizations

competed amongst themselves for City jobs awarded
through IGA. The IGA selected the organizations
which were to receive the jobs and based their deci-
sions on recommendations from political coordinators.

In order to effectuate the deceit, City departments
falsified ratings for applicants selected by the IGA by
giving them the highest scores. They then conducted
sham interviews to give the appearance of integrity to
the process, though the decisions had already been
made. Lastly, the official hiring authorities falsely
certified that politics played no part in their decision.
Sanchez participated in every aspect of the scheme. He
ran campaign organizations for the IGA for more than
a decade, as a City employee he falsified ratings forms
and as head of the Department, he directed his
personnel officer to submit names of HDO participants
to the IGA for hiring.

While working as a city employee in the late 1980s and
early 1990s, Sanchez was the leader of a political group
in the southeast side of Chicago. Sanchez was ap-
proached by the then Mayor's campaign manager who
sought assistance from Sanchez's group. In exchange
for that Sanchez sought assurances that his group
would not be forgotten. Around the same time, Sanchez's
political group merged with other Hispanic political
organizations from the north and west sides of Chicago,
forming the HDO. Sanchez led a branch of the HDO and
the precinct workers under his leadership primarily
canvassed neighborhoods during elections and raised
funds. Because the workers were not paid, the HDO

sought to secure City jobs for its employees, which helped the group grow in numbers and influence. Sanchez's branch of the HDO had a specific protocol for its workers in which requests for City jobs were given to the worker's respective HDO coordinator who in turn recommended their precinct workers to Sanchez or Aaron Del Valle.

Sanchez served as the Deputy Director of the Mayor's Office of Inquiry and Information ("Office") in the early 1990s and the personnel administrator for the Office was Bob Medina. In 1993, Arturo Salinas was seeking employment with the City and heard that working for the HDO was an way to enhance his prospects. Salinas began working for the HDO and eventually met with Sanchez at City Hall, after which Sanchez directed Medina to hire Salinas. Sanchez then falsified ratings sheets and *Shakman* certifications and signed a document stating that an interview of Salinas occurred, when in fact it had not. All of this was done after the hiring decision was made. Sanchez did the same for another HDO worker who he never actually interviewed.

In 1999, Sanchez became the Commissioner of the Department and though he no longer had to complete personnel documents associated with hiring decisions, all such decisions flowed through him. Jack Drumgould was Sanchez's personnel director and met with him routinely to discuss hiring for vacancies. Drumgould would give Sanchez a packet of personnel documents every two weeks which listed various vacancies and applicants for those jobs. Sanchez would then read the

list, highlight or check the selected applicants who should be hired and returned the packet to Drumgould. Sanchez never made reference to the interviews or ratings sheets for the applicants he selected. However, he occasionally would make reference to the HDO and on one occasion, in 2003, Del Valle entered the room while Drumgould and Sanchez were discussing an applicant list. Sanchez asked Del Valle whether a particular person had worked for the HDO and when he received an affirmative answer, he highlighted his name for hiring. The IGA had the final say on hiring decisions and often would send lists back and forth with Sanchez before finalizing the hiring decisions. Following approval of the list by IGA, Drumgould and another Department official would falsify the ratings sheets and interview records to reflect positively on the applicants selected.

In 2002, the Bureau of Electricity within the Streets and Sanitation Department sought positions for Lamp Maintenance Man who replaced lightbulbs, cleaned light fixtures, alley lights, streetlights and traffic signals. This was an entry level position, but was considered an essential stepping stone to higher positions within the Bureau. Over six hundred people applied for sixteen positions and one hundred and eleven individuals were interviewed. The ratings for the position were much the same as those discussed *supra*. Prior to the interview process, Sanchez reviewed a list of applicants for the position and selected two individuals, Alejandro Duran and Robert Aguirre, to submit to the IGA for approval. Aguirre had previously worked with the

HDO and specifically with Del Valle. He did not have the minimum requisite experience for the position, but by virtue of Sanchez's selection, he was interviewed and ultimately hired. Another applicant for one of the sixteen positions was Benita Mangrum, an electric signal specialist for a railroad who had an associate's degree in mathematics and four years of experience with the railroad. Mangrum unfortunately had never contributed man-hours to political campaigns and though she was interviewed she was not hired. She received her rejection letter via United States mail.

Aaron Del Valle managed campaigns staffed by Sanchez's branch of the HDO and held the title of "coordinator of coordinators". During the investigation into Sanchez, Del Valle testified before a grand jury. This testimony concerned his conversations with other HDO coordinators, the spreadsheets he maintained on his computer that pertained to HDO coordinators and City jobs and his personal role, if any, in the process of getting HDO workers City jobs. Del Valle denied having any role as to the hiring process and also denied having any conversations with HDO coordinators about rewarding campaign work with City jobs. Del Valle also denied that the spreadsheets he maintained were connected to HDO workers seeking City jobs. Del Valle stated that his role was limited in nature. It amounted to checking "lottery lists" for HDO volunteers. These lottery lists were used by the Department to generate random lists of applicants for interviews for hand laborers and motor truck drivers. Del Valle stated further that Gil Valdez, an HDO coordinator asked him to check a lottery list.

Del Valle's actual role in the hiring scheme was far greater and he wielded significant influence. Being the "coordinator of coordinators" practically speaking, meant that all coordinators were to submit their list of workers seeking City jobs to Del Valle. Del Valle instructed HDO workers to submit their job requests to their coordinator who would then submit it to Del Valle. At trial, HDO coordinators and a precinct captain testified as to their dealings with Del Valle. These witnesses testified that on different occasions, they would approach Del Valle with requests for City jobs for their workers. The critical inquiry for the workers always centered on their political campaign work. Del Valle kept records of some coordinators and their requests for hiring or promotion on his City computer. One spreadsheet found on his computer contained a list of individuals seeking City jobs, sorted by their HDO coordinator and bore an electronic date of April 27, 2004. A fax dated April 28, 2004 from the Department to IGA listed the same individuals, in almost identical order with the handwritten notation "Al's Picks", indicating these were the individuals Sanchez picked for the positions.

A grand jury charged Sanchez with nine counts (1-9) of mail fraud, in violation of 18 U.S.C. § 1341 and Del Valle with one count (10) of perjury in violation of 18 U.S.C. § 1623. Prior to trial in March 2009, the government dismissed counts 3 & 6 and following trial, a jury found Sanchez guilty of counts 1, 5, 7 & 9. Del Valle was found guilty of one count of perjury. Following the trial, the district court conducted an evidentiary hearing

and granted Defendants' motion for a new trial. In July 2010, the government dismissed counts 1 & 5 against Sanchez and proceeded to trial on counts 7 & 9 and the one count of perjury against Del Valle. During the course of the trial, the government dismissed count 7 against Sanchez, and a jury found him guilty of one count of mail fraud and Del Valle guilty of one count of perjury.

During the re-trial, the government cross-examined Sanchez regarding certain claims he made under direct examination. Specifically, the defense elicited testimony concerning Sanchez's tireless work ethic and his good standing with every alderman in the City. The government's objections to this testimony were overruled. Sanchez himself testified at the trial and made similar statements and upon cross-examination by the government, Sanchez adopted the statement that he worked for the City of Chicago 24 hours a day, 7 days a week and that he was available to the citizens of Chicago the same. The government then sought to introduce two instances of prior conduct of Sanchez that they claim impeached this statement. The first involved a motor vehicle accident in which Sanchez was allegedly driving intoxicated in a City-owned car. Sanchez denied being intoxicated. The second instance concerned a stop by a Chicago police officer on the Skyway in which Sanchez, who was passenger in the car, allegedly was intoxicated and confronted the police officer stating that he was exempt from traffic laws. The defense objected to the government's second question regarding the car crash which was overruled and on re-direct, Sanchez explained the situation on the Skyway. Following

Sanchez's testimony, the jury recessed and the defendant moved to strike the questions and answers regarding the two incidents. The district court eventually found that the questions were irrelevant and when the jury returned to the courtroom, gave a limiting instruction to disregard that portion of the testimony.

The limiting instruction stated in part "I want you to disregard both the questions that were put to Mr. Sanchez on cross-examination, his answers to those questions, and the questions and answers on redirect concerning the *two* incidents of alleged drunk driving."(emphasis added). The following day, Sanchez brought to the district court's attention the misstatement contained in the limiting instruction noting that there was only one instance of drunk driving and one instance in which he was the passenger in a vehicle. The district court proposed correcting the instruction to the jury but the defense opted to not bring it back to the jury's attention. Sanchez was ultimately convicted of the one count of mail fraud and on his motion for new trial, argued that the two incidents were irrelevant and prejudicial, and that the error in the curative instruction did not cure the prejudice. The court denied the motion after weighing the prejudicial effect of that limited aspect of the trial compared to the adequacy of the other evidence adduced. The court also found that the jury was able to understand and follow the instruction and found any error in the instruction harmless.

## II. DISCUSSION

Sanchez's first argument pertains to the district court's handling of the testimony regarding the incidents of driving while intoxicated and arguing with a police officer as a passenger. He also alleges that the indictment did not adequately allege a deprivation of "money or property" for purposes of mail fraud under 28 U.S.C. § 1341 and the district court's instruction that City jobs or promotions constitute "money or property" was in error.

### A. Prejudicial Testimony

The Court reviews an evidentiary ruling for an abuse of discretion. *United States v. Stallworth*, 656 F.3d 721, 727 (7th Cir. 2011). If an error is found, the verdict will not be reversed if the error was harmless. *United States v. Garcia*, 986 F.2d 1135, 1139 (7th Cir. 1993). Sanchez contends that the evidence the government introduced through cross-examination was not admissible under any circumstance, even as the government contends, as impeachment to the claims that Sanchez was available 24 hours a day, 7 days a week. The district court took Sanchez's side and overruled itself, noting that the evidence was largely irrelevant to anything. Sanchez argues that eliciting this evidence was improper by the government and that it deprived him of a fair trial and amounted to prosecutorial misconduct. However, the district court noted that it gave the defendant significant leeway in establishing Sanchez's "good faith" in his employment, and therefore was apparently only

trying to balance the scope of the evidence. As the district court noted, the evidence had little to do with the scheme of fraudulent hiring and should not have been admitted. The crux of the issue here is the prejudicial effect the evidence had on the jury and the ability of the erroneous curative instruction to address that.

The test for determining whether an error was harmless is "whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the evidence been excluded." *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010) (internal quotation marks and citations omitted). Sanchez argues that drunk driving is an emotional crime to which those impacted by it may be particularly sensitive. Sanchez also argues that the prejudicial impact in this case was compounded because it was the government that made the accusations. Furthermore, because Sanchez's main argument was that he acted in good faith in making recommendations to the IGA, his defense was severely and unfairly undercut.

Driving under the influence is a serious matter and certainly it has negatively impacted many people. However, it is not of such a unique nature that a mention of an uncharged instance could be said to have significantly bolstered the government's case. In other words, the mention of drunk driving was an error and was prejudicial, but not so much so that its absence makes the government's case significantly less persuasive. Also, the fact that the government made the accusation

does somewhat compound the prejudice. However, this does not amount to making the prosecution's case significantly less persuasive had these accusations not been made. Sanchez explained the incidents on re-direct and therefore had the opportunity to address them in front of the jury. Furthermore, there was a large amount of evidence that suggested Sanchez was fully aware of the scheme and was not acting in good faith.

**B. Erroneous Curative Instruction**

Sanchez next argues that the curative instruction given by the district court actually exacerbated the problem. Generally, "jurors are presumed to follow the limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002). Absent evidence of an "overwhelming probability" that the jurors were unable to follow the instructions, they are presumed to have done so. *United States v. James*, 434 F.3d 518, 524 (7th Cir. 2007) (quoting *United States v. Eberhart*, 434 F.3d 935, 939 (7th Cir. 2006)).

The argument of course is that an erroneous limiting instruction is not sufficiently curative. The district court admonished the jurors that they were to disregard the line of questioning because the evidence was irrelevant and had nothing to do with the case. The district court noted that the jurors were outwardly showing acknowledgment of its instruction in that they were nodding their heads in agreement as he gave the instruc-

tion. The misstatement in the instruction does not indicate that the jurors would assume there was a third unexplained incident involving alleged drunk driving as Sanchez argues. Furthermore, the curative instruction came the same day as the testimony and referred to a specific and small portion of cross-examination and re-direct examination. The cases relied upon by Sanchez differ from the situation with which he was confronted. The challenged questions in *United States v. Impson*, 531 F.2d 274, 276 (5th Cir. 1976) and *Hill v. Turpin*, 135 F.3d 1411, 1419 (4th Cir. 1998) dealt with post-*Miranda* silence, a well-established right from which improper inferences easily arise. Here, the questioning had nothing to do with the case against Sanchez, the district court recognized that and instructed the jury to disregard the testimony. Finally, given the amount of evidence against Sanchez, it is unlikely that a minor misstatement was enough to wrongly persuade the jury. In sum, there has not been a showing of an overwhelming probability that the jury was unable to follow the district court's limiting instruction, albeit misstated as it was.

Focusing on the erroneous curative instruction and error in admitting the evidence of alleged bad acts by Sanchez ignores the abundance of evidence which suggested he was guilty. As such, any error was harmless.

## C. Sufficiency of the Indictment

Sanchez argues that the indictment, which alleged mail fraud in violation of 18 U.S.C. § 1341, was insuf-

ficient because City jobs are not money or property. Sanchez urges that this Court's opinion in *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) should be overruled. The Court reviews *de novo* Sanchez's contention that the indictment insufficiently alleged a deprivation of money or property. See *United States v. Moore*, 446 F.3d 671, 676 (7th Cir. 2006).

Sanchez argues that jobs are not money or property for purposes of mail fraud and that the city suffered no economic harm; therefore a charge of mail fraud in violation of 18 U.S.C. §1341 cannot be sustained. These arguments have been addressed by this Court and rejected. See *Sorich*, 523 F.3d at 713 ("we hold that jobs are property for purposes of mail fraud"). Furthermore, whether or not jobs are "property", the money paid for the job (that is, the salary) is "money". The City of Chicago did not get the employees that it wanted to hire and thus was cheated out of money. Sanchez's contention that the workers he hired were just as good as those the City wanted is irrelevant and misses the point. The City, not Sanchez, gets to set the criteria for hiring.

Sanchez relies on *United States v. Skilling*, 130 S.Ct. 2896 (2010), noting that the Supreme Court, in discussing the history of the development of honest-services fraud, distinguished between honest services fraud and fraud involving loss of money or property. However, *Skilling* dealt with honest-services fraud, not traditional mail fraud as is the case here and therefore his reliance on *Skilling* is misplaced.

As the law stands, the government need not establish an economic loss or pecuniary harm in order to sustain

a charge of mail fraud and city jobs are money or property for purposes of mail fraud and the indictment sufficiently alleges a deprivation of money or property.

### D.  Del Valle's Severance

Sanchez's co-defendant in this case is Aaron Del Valle, a coordinator who worked for Sanchez in the HDO. Del Valle argues that he was denied a fair trial by virtue of being joined with Sanchez. The Court reviews a district court's denial of severance under Federal Rule of Criminal Procedure 14 for an abuse of discretion. *United States v. Morales*, 655 F.3d 608, 624 (7th Cir. 2011). The standard for severance is that "when defendants have been properly joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Here, Del Valle challenges only the district court's denial of his motions for severance thus denying him the right to a fair trial. This falls well short of establishing a serious risk as required to meet the Supreme Court standard. Del Valle argues that the disparity in weight of evidence against Sanchez and himself and the complex nature of the evidence denied him the right to a fair trial. However, the existence of a disparity in weight of evidence against a moving de-fendant and co-defendants does not itself amount to grounds for severance. *United States v. Serpico*, 320 F.3d

690, 696 (7th Cir. 2003). This fear of "spill-over" can be mitigated sufficiently when there is ample evidence to convict the moving defendant and when jury is given instructions to assess each defendant individually. *United States v. Alviar*, 573 F.3d 526, 539 (7th Cir. 2009).

The disparity in evidence here is apparent as a majority of the evidence pertained to Sanchez. However, it is clear from the record that there was ample evidence to support Del Valle's conviction for perjury based on his answers to the grand jury. Additionally, the government was required to put Del Valle's answers into context in order to show how he perjured himself. This required presentation of witnesses and evidence that were used against both himself and Sanchez and the jury was instructed to assess the evidence separately as to each defendant. The district court properly considered each request for severance by Del Valle, and its conclusion in denying them does not constitute an abuse of discretion. Because we find that there was no abuse of discretion by the district court, we need not address whether Del Valle waived his severance argument for failing to raise it at the close of evidence.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the convictions of the defendants.