In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 11-2839, 11-2844 & 11-2896

ROBERT SORICH, TIMOTHY MCCARTHY, and
PATRICK SLATTERY,

*Petitioners-Appellants*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 10 CV 1069, 10 CV 1089 &
10 CV 1091—**Joan Humphrey Lefkow**, *Judge.*

ARGUED MAY 31, 2012—DECIDED FEBRUARY 27, 2013

Before RIPPLE, MANION, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Robert Sorich, Timothy McCarthy, and Patrick Slattery were convicted of mail fraud for their roles in a scheme to award City of Chicago jobs and promotions to favored applicants. Consistent with our case law at the time, the jury was instructed that the defendants were guilty of mail fraud if they deprived

the City of money or property, or if they deprived the City of its right to honest services. After we affirmed the defendants' convictions, the Supreme Court ruled that the honest-services fraud statute is limited only to schemes involving bribes or kickbacks. *Skilling v. United States*, 130 S. Ct. 2896 (2010). In light of *Skilling*, the petitioners maintain they are entitled to collateral relief under 28 U.S.C. § 2255. We agree with the district court that although we now know the jury's receipt of an honest-services theory was error because this scheme did not involve bribes or kickbacks, the error was harmless. The trial reflected a single scheme to take City jobs and promotions through false representations, and these jobs and promotions were the City's money or property. Any honest-services violation had to be premised on the money/property fraud, and the *Skilling* error did not have substantial effect on the jury's verdict. Therefore, we affirm the decision of the district court.

## I. BACKGROUND

We will offer only a brief summary of the background facts here and will assume familiarity with our prior opinion. *See United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), *reh'g en banc denied*, 531 F.3d 501, *cert. denied*, 555 U.S. 1204 (2009). Despite a court order forbidding the award of City jobs on the basis of any political reason or factor (other than certain exempt jobs not at issue here), the petitioners helped administer a political patronage system that impacted hiring and promotion in

multiple City of Chicago departments. Sorich was the Assistant to the Director of Intergovernmental Affairs ("IGA") in the mayor's office, and McCarthy was his deputy for several years. Political campaign coordinators and others, including aldermen and community leaders, gave Sorich and the IGA lists of campaign workers and volunteers for whom they sought City jobs or promotions, and these names would then be passed on to the heads of various City departments. Among these was the Department of Streets and Sanitation, where Slattery was in charge of supervising the department's hiring and promotion process.

The jury heard that department managers held sham interviews and falsified interview forms in favor of the persons on the IGA lists. Some positions such as tree trimmer had merit tests, but the results were frequently ignored. Pursuant to federal consent decrees known as the "*Shakman* decrees," politics could not play a role in City of Chicago hiring (other than in policy-making jobs), yet scheme members repeatedly and falsely signed "*Shakman* certifications" attesting that political patronage had not affected hiring decisions. The result of all this, of course, was that in most cases, the persons on the IGA lists received the jobs or promotions they wanted.

One particularly damaging piece of evidence concerned a list that Sorich's secretary kept of the names of about 5,700 persons who sought jobs through the IGA through 1997, the political sponsor of each applicant, and whether the request was successful or not. The jury

heard that after he feared the FBI might discover the list, Sorich ordered the document destroyed. The FBI was able to recover the list from the hard drive.

A superseding indictment charged the petitioners with participating in a mail fraud scheme in violation of 18 U.S.C. §§ 1341, 1346, and 2. The instructions the jury received, as was common in federal fraud prosecutions at the time, stated that the scheme to defraud was one intended to deprive the City of money or property, or of honest services. The jury was instructed that to sustain the mail fraud charges, the government had to prove that the petitioners "knowingly devised or participated in the scheme to defraud or to obtain money or property by means of materially false pretenses, representations, promises, or material omissions, as charged," that they did so with an intent to defraud, and that they used the mail to do so. The instructions then defined a "scheme to defraud" as "a scheme that is intended to deceive or cheat another and to obtain money or property, or intended to cause the loss of money or property to another, or intended to deprive a governmental entity of the honest services of its employees for personal gain to a member of the scheme or another." (The term "personal gain" was not defined; neither party requested that it be.) Similarly, "intent to defraud" was defined to mean "that the acts charged were done knowingly with intent to deceive or cheat the City of Chicago and the people of the City of Chicago in order to cause a gain of money or property to [petitioners] or others or the potential loss of money or property to another, or to deprive the City of Chicago

and the people of the City of Chicago of their right to the honest services of their public employees."

After a seven-week trial and nearly five days of deliberations, the jury found Sorich guilty on two counts of mail fraud and not guilty on two other counts, and it found McCarthy and Slattery guilty of one count of mail fraud each. We affirmed their convictions on direct appeal. *Sorich*, 523 F.3d 702. The petitioners filed motions pursuant to 28 U.S.C. § 2255 challenging their convictions, and the district court stayed briefing pending the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010). The Supreme Court held in *Skilling* that the honest-services fraud proscribed in 18 U.S.C. § 1346 applies only to schemes involving bribery or kickbacks. The district court later denied the petitioners' § 2255 requests, ruling that the jury instructions were incorrect in light of *Skilling* but that the error was harmless because the scheme was designed to obtain City property. The petitioners appeal.

## II. ANALYSIS

The petitioners maintain that their mail fraud convictions must be set aside on collateral review in light of the Supreme Court's decision in *Skilling*. We review the legal conclusions in a district court's denial of a § 2255 motion de novo and any findings of fact for clear error. *Gant v. United States*, 627 F.3d 677, 681 (7th Cir. 2010). The district court made no factual findings here, so our review is de novo. *See Bethel v. United States*, 458 F.3d 711, 716 (7th Cir. 2006).

The government does not dispute that *Skilling* applies retroactively to cases on collateral review. *See, e.g., Turner v. United States*, 693 F.3d 756, 758 (7th Cir. 2012) (reviewing claim of *Skilling* error on collateral review). It also does not contend that the petitioners procedurally defaulted the argument they make now, and we agree that this is not a case of procedural default. The petitioners argued to the trial court and on direct appeal that the honest-services jury instructions impermissibly expanded the scope of that crime beyond that proscribed by 18 U.S.C. § 1346. They also argued that the private gain standard we set forth in *United States v. Bloom*, 149 F.3d 649 (7th Cir. 1998), was valid only to the extent it required a showing of personal gain to the petitioners or other co-schemers, and that any broader reading of *Bloom* would render the honest-services statute unconstitutional. In light of these arguments, we will not apply the doctrine of procedural default to preclude the petitioners from making their current argument.

With those initial hurdles aside, we turn to the heart of the appeal. Because the scheme in this case did not involve bribery or kickbacks, the government concedes that giving the jury an honest-services theory of mail fraud was wrong in light of *Skilling.* The government maintains, however, that the error was harmless. The Supreme Court ruled in *Yates v. United States*, 354 U.S. 298 (1957), that constitutional error occurs when a jury is instructed on alternative theories of guilt and returns a general verdict that may have relied on a legally invalid one. But the Supreme Court has decided, including in *Skilling*, that such an error is subject to

harmless-error analysis and does not necessarily require reversal. *Skilling*, 130 S. Ct. at 2934; *see also Hedgpeth v. Pulido*, 555 U.S. 57, 58 (2008) (per curiam). Our question, therefore, is whether the error in this case was harmless.

We have described the harmless-error inquiry in a claim of *Skilling* error as a question of whether the trial evidence was such that the jury must have convicted the petitioners on both theories of fraud—money/property and honest services. *See Turner*, 693 F.3d at 759 (reviewing claim of *Skilling* error on collateral review). Or, stated differently, "if the evidence on the two fraud theories was so thoroughly coextensive that the jury could only find the defendant guilty or not guilty of both, then the conviction will stand even though one theory is later held to be legally invalid." *Id.* We quoted in *Turner* from our explanation in *United States v. Segal*, 644 F.3d 364 (7th Cir. 2011):

> So the issue here boils down to this: would the jury still have convicted Segal had it not been told that in addition to the valid money/property fraud allegations, an allegation of honest services fraud could also be taken into consideration? We conclude that the jury would—and almost certainly did—convict Segal for money/property fraud, irrespective of the honest services charge. This is because even if the jury concluded that there was an honest services violation, that violation had to be premised on money/property fraud. That is, to the extent Segal was depriving

> others of his honest services, it was because he
> was taking their money.

*Turner*, 693 F.3d at 759 (quoting *Segal*, 644 F.3d at 366); *see also United States v. Black*, 625 F.3d 386, 393 (7th Cir. 2010) (finding harmless error where "[n]o reasonable jury could have acquitted the defendants of pecuniary fraud on this count but convicted them of honest-services fraud").

The parties both take the position that on collateral review, the error in instructions will result in reversal only if the error had "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). This inquiry does not ask whether the jurors "were . . . right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision." *Kotteakos*, 328 U.S. at 764. If a court is in "grave doubt" about whether the error is harmless, meaning that, "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error," the court is to treat the error as though it affected the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). We will apply this standard as well. *Cf. Ryan v. United States*, 688 F.3d 845, 848 (7th Cir. 2012) (considering case under harmless-error inquiry, framed as though it were direct appeal, where government had not argued in its initial brief that standard on collateral review was different).

We are not in "grave doubt" here. After reviewing the record, we are assured that the *Skilling* error did not have "substantial and injurious effect or influence" in determining the jury's verdict. And as in *Turner* and *Segal*, we conclude that the jury would still have convicted the petitioners on the money/property fraud allegations even if it had not received an honest-services fraud theory to consider. As in those cases, the two fraud theories here were coextensive; any honest-services violation had to be premised on money/property fraud. The government alleged, and the evidence showed, a single scheme by the petitioners to fraudulently award City jobs and promotions to individuals based on political considerations despite the outward appearance that all City hiring policies and procedures were being followed. The honest-services theory and instructions did not have substantial and injurious effect or influence on the jury's conclusion that the petitioners were guilty of mail fraud.

The indictment did not distinguish between an honest-services scheme and a money/property scheme or between the bases for the two theories. Instead, the indictment alleged a single scheme to defraud the City of "money, property, and the intangible right to the honest services" of the petitioners "and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and material omissions." More particularly, it alleged that the petitioners "engaged in a systematic effort to provide financial benefits, in the form of City jobs and promotions, in exchange for campaign work" and that

Sorich and McCarthy "corrupted the City's personnel process by directing the awarding of jobs and promotions in non-policymaking positions to candidates pre-selected by IGA through sham and rigged interviews."

The trial also reflected a single scheme. In its opening statement, the government explained that the case was about City jobs:

> In summary, there are four things that this case is about. It is about rewarding political workers with City jobs. It is about rigging the promotion process for City jobs. It is about violating the law, including this federal court order which unmistakably and unequivocally banned political considerations for these very jobs that I've been talking about. And it's also about the extra-ordinary efforts that were taken by each of these defendants in different ways to conceal what they were doing.

The evidence at trial also reflected a single scheme, where, as we previously recognized, "getting the city to award jobs to political workers and cronies was the very object of the defendants' scheme." *Sorich*, 523 F.3d at 713. There was not an independent honest-services scheme. Instead, all the evidence related to the fraudulent selection or promotion of City jobs. The jury heard that the petitioners falsified ratings forms and falsely signed certifications attesting that political considerations had played no part in the hiring decision, all so that pre-selected persons would receive jobs and promotions. The jury also heard instances where persons

received jobs despite being unqualified for them. The government's closing arguments similarly detailed, at length, the single scheme to defraud the City.

The petitioners nonetheless maintain that the honest-services instructions had substantial and injurious effect on the jury's determination that the petitioners were guilty of mail fraud. For one, the petitioners argue that a properly instructed jury would not necessarily have found that the jobs given out through patronage were "property" under the mail fraud statute. *See* 18 U.S.C. § 1341 (criminalizing, among other things, use of mail "for obtaining money or property by means of false or fraudulent pretenses"). But we held on direct appeal "that jobs are property for purposes of mail fraud." *Sorich*, 523 F.3d at 713. The petitioners contend that this conclusion only applied to the sufficiency of the allegations in the indictment, and they argue that the private gain in the form of a City job or promotion obtained through patronage does not necessarily entail a deprivation of the City's property. We rejected on direct appeal the argument that the City had not suffered a loss since it would have filled the jobs and paid the salaries anyway. *Sorich*, 523 F.3d at 713. The scheme to distribute City jobs deprived the City of its right to control how its money was spent. We reaffirm our previous discussion and conclusion that the jobs here are property for purposes of mail fraud, and, in any event, as we later said in *United States v. Del Valle*, "whether or not 'jobs' are property, the money paid for the job (that is, the salary), is 'money.'" 674 F.3d 696, 704 (7th Cir. 2012).

Relatedly, the petitioners argue that the jury did not necessarily conclude that the petitioners schemed to deprive the City of money or property. To obtain the mail fraud convictions, the government needed to prove that the petitioners acted with the intent to defraud. *United States v. Jackson*, 546 F.3d 801, 810 (7th Cir. 2008). The petitioners argue that because they received no cash themselves, the jobs were filled, and work was getting done, the jury might have thought that the petitioners did not intend to deprive the City of any money or property. But the jury heard that, consistent with the petitioners' wishes, jobs went to people who were not qualified for them. It heard that applicants took job-related tests where the test results were ignored. It heard in detail, for example, the story of IGA intervention in the hiring of a building inspector where, only because of the IGA's involvement, the position went to a person who lacked the requisite experience and only after interview scores were changed and documents backdated. The jury also heard all about the petitioners' roles in the falsification of interview reports and the false signing of *Shakman* certifications attesting that hiring had not been the result of political patronage, when in fact it had. As we explained in another challenge to a mail fraud conviction involving this same IGA scheme:

> The City of Chicago did not get the employees that it wanted to hire and thus was cheated out of money. [The defendant]'s contention that the workers he hired were just as good as those the City wanted is irrelevant and misses the point.

The City, not [the defendant], gets to set the criteria for hiring.

*Del Valle*, 674 F.3d at 704.

The petitioners also argue that in light of the evidence the jury heard that persons who received the jobs and promotions gave free assistance to political campaigns, the jury might have concluded that the private or personal gain in this case was the campaign benefits received by members of the Democratic political machine. To find an honest-services violation, the jury was instructed that it had to find a private gain. *See United States v. Black*, 625 F.3d 386, 391 (7th Cir. 2010) (noting that such an instruction was proper before *Skilling*). If the jury found that campaign benefits constituted the private gain, then the petitioners contend that the jury could have concluded that the scheme involved only honest-services fraud but not money/property fraud, and so, they contend, the honest-services instruction had substantial and injurious effect in determining the jury's verdict.

We disagree. Any political benefits that accrued to others occurred only as a result of City jobs being doled out the way that they were. *Cf. Segal*, 644 F.3d at 366 ("[T]o the extent Segal was depriving others of his honest services, it was because he was taking their money."). As the district court explained, "while Democratic candidates may have gained political advantage from petitioners' scheme, that gain depended on city jobs being handed out based on illegitimate considerations." This is clear from the evidence, and it was also the govern-

ment's position at trial. It said, for example, in its opening statement: "[W]e are not here to say that politics is a dirty word. But what makes it dirty was that when it's used as a motive to hand out jobs, tax-payer subsidized jobs . . . when taxpayer jobs are the fuel for this scheme, are the reward or the carrot for participating in the Mayor's organization, political organization, that's wrong . . . that's a crime." The govern-ment argued in its closing argument that the advantage to political campaigns was based on "labor that was paid for . . . using City jobs and City money" and said in its rebuttal that the petitioners "took too much power and abused that power by stealing City jobs and did so in order to subsidize and otherwise facilitate the cam-paigns of favored politicians and awarding those who acted as foot soldiers in this patronage army by giving them City jobs and City promotions paid for by the tax-payers." The government never argued that the jury should convict based on an honest-services theory that was separate from the award of City jobs through false representations. So while the motive for the scheme may have been to get campaign help, the way the peti-tioners achieved that goal was to give out City jobs in an improper manner. Because the City jobs and promo-tions were money/property, the erroneous honest-services instruction did not have an injurious effect on the verdict.[1]

---

[1] We also note that the district court recognized that "very little, if any, evidence was introduced on the advantage reaped

(continued...)

The petitioners also point to statements in the government's opening statement and closing argument, such as "this is a case about breach of the public trust" and the petitioners' actions constituted a "perversion of the public trust." They also emphasize the government's statement in its rebuttal closing argument that the scheme was meant to deprive people of "something more important" than money in performing the jobs because a scheme that "deprives the people of the trust they placed in their employees is a depr[i]vation of honest services. That itself is a violation of the federal mail fraud statute."

These arguments do not help put us in doubt about whether the *Skilling* error was harmless. The argument that the petitioners' actions breached the public trust emphasized the egregiousness of the scheme, and it was a valid argument to make even under just a money/ property theory. The City did argue in its closing argument that depriving the City of honest services violated the mail fraud statute, and we now know that was improper because the scheme did not involve bribes or kickbacks. But the jury was also instructed that it could not convict on an honest-services theory unless it found private gain. Because we presume that a jury follows its instructions, *Christmas v. City of Chicago*, 682

---

[1] (...continued)

from having a political organization, with the vast majority of the evidence focused instead on how the patronage system operated, including the fact that individuals engaged in political work to obtain city jobs and promotions."

F.3d 632, 641 (7th Cir. 2012), and because we have already concluded that the private gain here must have involved money or property, the government's statement does not warrant setting aside the verdict. Similarly, although the petitioners suggest that a jury might have determined their repeated violations of the *Shakman* decree to constitute only honest-services fraud, the *Shakman* violations were about City jobs. And falsifying documents to get City jobs to certain applicants meant giving City jobs and money to favored applicants. In short, the jury's guilty verdicts mean the jury necessarily would have concluded that the petitioners were guilty on a money/property theory, and so the honest-services theory did not have substantial and injurious influence on the jury's verdict. *See, e.g., Segal*, 644 F.3d at 366; *Messinger v. United States*, 872 F.2d 217, 222 (7th Cir. 1989) (concluding that for jury to find defendant guilty of mail fraud for defrauding county of its intangible rights, it must have found that the county was defrauded of its security interest represented by a cash bail bond); *United States v. Doherty*, 867 F.2d 47, 58 (1st Cir. 1989) (Breyer, J.) (upholding conviction where jury not presented with a money/property fraud theory and only given a later-invalidated intangible-rights theory, because it was "virtually inconceivable" that the jury could have found the defendants guilty of mail fraud without believing they were conspiring to deprive the state of money in the form of job promotions and salaries).

Finally, the petitioners argue that the more avenues open to the jury to reach a guilty verdict, the more likely

it is that the randomness inherent in the jury process will produce a conviction. They say that the government fought to have the honest-services theory included in the jury instructions, and they point out that in another case involving this same scheme, a jury acquitted the defendant of money/property fraud but convicted him of honest-services fraud. *See United States v. Sanchez*, No. 07 CR 149 (N.D. Ill.). (The government notes that when the defendant was later re-tried on only a single money/property fraud count, however, he was convicted.)

We do not know why the initial *Sanchez* jury acquitted on the honest-services fraud charge, but we must presume that juries follow the instructions they receive. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). We have explained that "[a jury] has the *power* to acquit on bad grounds, because the government is not allowed to appeal from an acquittal by a jury. But jury nullification is just a power, not also a right, [ ], as is shown among other things by the fact . . . that a trial error which favors the prosecution is harmless if no *reasonable* jury would have acquitted, though an actual jury might have done so." *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir. 1988) (internal citations omitted); *see also Smith v. Winters*, 337 F.3d 935, 938 (7th Cir. 2003) ("A defendant has of course no right to ask the jury to disregard the judge's instructions ('jury nullification').") The petitioners point to no court that has suggested that the "randomness inherent in the jury process" is a proper consideration in a harmless-error analysis, and we decline to find that it is here.

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.