In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 13-3847, 14-2214, 14-2215, 14-3533

UNITED STATES OF AMERICA,

*Plaintiff-Appellee / Cross-Appellant*,

*v.*

MICHAEL SEGAL,

*Defendant-Appellant / Cross-Appellee*.

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 CR 112-1 — **Rubén Castillo**, *Chief Judge*.

ARGUED OCTOBER 30, 2015 — DECIDED JANUARY 21, 2016

Before POSNER, RIPPLE, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. Some years ago Michael Segal—
lawyer, certified public accountant, insurance broker—was
indicted along with Near North Insurance Brokerage
(NNIB), a company he owned, for multiple violations of fed-
eral law. He was charged with racketeering, mail and wire
fraud, making false statements, embezzlement, and conspir-

ing to interfere with operations of the Internal Revenue Service. NNIB was charged with mail fraud, making false statements, and embezzlement. Both defendants were convicted in 2004, and the following year Segal was sentenced to 121 months in prison. *United States v. Segal*, 495 F.3d 826, 830 (7th Cir. 2007). After further proceedings, see 644 F.3d 364 (7th Cir. 2011), he was resentenced to time served and ordered to pay $842,000 in restitution and to forfeit to the government his interest in the company and $15 million.

To resolve a series of disputes that arose over the forfeiture judgment and had not been resolved either by the district court or in either of the decisions (cited above) by this court, the parties in 2013 agreed to a binding settlement that specified the final ownership and disposition of certain of Segal's assets. Segal, by then released from prison, participated actively, indeed aggressively, in the negotiation of the settlement. But after the district judge approved the settlement the parties clashed over three issues concerning the disposition of Segal's assets and returned to the district court for a resolution of those issues. The judge resolved two of them against Segal and the third in his favor, giving rise to three appeals—two by Segal, one by the government—that we have consolidated for briefing, argument, and decision. (They were separate appeals, rather than a single appeal, because the orders giving rise to them had been issued by the district court at different times.) The fourth appeal, No. 14-2215, related to a writ of mandamus filed by Segal that he has now abandoned; we ignore it.

The first of Segal's two appeals relates to insurance policies on his life. The settlement agreement gave him two of the eight policies outright and an option to purchase all or

some of the others, but required that he exercise the option within six months of the district court's approval of the settlement; otherwise the option would be forfeited. He opted to purchase one of the remaining six policies before the deadline and asked the court to extend the deadline for the others. He said he needed time to raise money to buy them because the government hadn't promptly released money owed to him. He also complained that the government had delayed his efforts to obtain information from the insurance companies.

The judge refused to extend the deadline, pointing out that paragraph 9(e) of the settlement agreement "sets up a very precise timeframe that doesn't condition [the deadline for exercising the right to purchase the insurance policies] on the release of other moneys." The paragraph gives Segal

> a right to exercise an option to purchase all remaining insurance policies held by Near North Insurance Brokerage as listed on Exhibit A at the cash surrender value computed when, and if, the option is exercised. The option to purchase these insurance policies must be exercised no later than six months from the date the Settlement Stipulation is approved by this Court. Segal shall exercise this option by sending a letter to the United States Attorney for the Northern District of Illinois, to the attention of the undersigned Assistant United States Attorney, which identifies the policy or policies he intends to purchase. Within thirty days of receipt of the letter, the cash surrender values of the policy or policies shall be provided to Michael Segal. Fifteen days after receipt of the cash surrender information, defendant Segal shall pay good funds for the purchase of the policy or policies. If the option

> is not exercised or the funds are not received as re-
> quired, the government shall liquidate the policy or
> policies.

The method of exercising the option was thus clearly stated: the dispatch of a letter to the prosecuting assistant U.S. Attorney within six months of the court's approval of the settlement. If the letter was dispatched by the deadline, Segal would have up to 45 days to pay for the policies, depending on when the government told him what their cash surrender values were.

He argues that it was unreasonable to expect him to raise the money before the six-month deadline. Maybe so; but that was not the deadline for raising the funds—it was the deadline for notifying the government that he was exercising the option. He would have had an additional 15 days at least, and 45 at most, after the six-month deadline to raise the money, but only if he exercised the option before the deadline.

He argues that the government withheld from him both information that he needed in order to determine the value of the policies that he was considering trying to buy and also cash that the government was obligated to return to him after he satisfied the forfeiture judgment. These arguments have no merit. The government helped Segal obtain information about the policies (namely their cash surrender values) prior to the option deadline by writing the insurance companies. Although one of the companies was slow to supply the information, that was not the government's fault. In any event paragraph 9(e) required only that the government inform Segal of the cash surrender values of the policies after he had exercised his option to purchase them.

As for his annoyance that the government failed to promptly release funds to which he was entitled—funds he might have used to buy the policies—the option to buy them was not conditioned on the government's release of other assets to him. Nor was the government the only potential source of money with which to buy the policies. They had value and so a bank might have been willing to lend money against them. The loan would have enabled Segal to buy the policies and repay the loan once the government released the funds owed him.

He had only himself to blame for much of the delay in the government's release of funds to him. For example, the settlement agreement required him to transfer to the government his ownership interest valued at $750,000 in Sheridan House Associates, a real estate limited partnership. He refused on the ground that he'd conveyed half his ownership interest to his former wife back in 2003. But she had executed a release of her interest in all assets that the government had restrained, thus clearing away any obstacle to the transfer of the entire ownership interest to the government. Paragraph 11 of the settlement agreement states that if any property that was to be transferred to the government "is not available to satisfy the forfeiture judgment because it has been otherwise transferred, encumbered or alienated, indirectly or directly by defendant Segal, he shall owe the United States the appraised value of the asset."

Had Segal transferred the ownership interests promptly, he would have received $750,000 that he could have invested in the purchase of the insurance policies. But he refused to execute a release of his interest. Six months of litigation ensued, in which the ex-wife intervened seeking a share of the

ownership interest. The dispute was finally resolved when
the district judge ordered that the entire interest be trans-
ferred and that the government release the $750,000 to Segal.
But by then the deadline for the exercise of the option to buy
the insurance policies had expired; the fault was Segal's and
his ex-wife's.

Segal's second objection to the administration of the set-
tlement agreement relates to the Chicago Bulls basketball
team. As part of the settlement, the government retained half
of Segal's ownership interest in the Bulls, an interest consist-
ing of a 1.7 percent limited partnership interest in the Chica-
go Bulls basketball franchise, a 1.1 percent interest in its sta-
dium (the United Center), and a 1.1 percent interest in its
broadcasting company (Bulls Media)—for simplicity we'll
call the entire package the Bulls investment, the value of
which the government estimated at $4.175 million. The set-
tlement agreement gave a half interest back to Segal plus a
right of first refusal of any offer made to the government for
its half interest—but with conditions, as explained in para-
graph 9(f) of the settlement agreement:

> Defendant Michael Segal shall retain the right of
> first refusal on a commercially reasonable, respon-
> sible cash offer made to the United States for the
> purchase of the government's ownership interest
> within six months of the approval of the Settlement
> Stipulation. Within seven days of receipt of an ac-
> ceptable offer, the United States shall notify Mi-
> chael Segal of the offer. To exercise his right of first
> refusal to purchase the interest of the United States,
> Michael Segal must notify the United States Attor-
> ney for the Northern District of Illinois, within sev-
> en days of receiving said notice from the United

States[,] of his intent to purchase the government's interest in the partnership at the cash offer received, and within ten days of serving notice shall provide good funds in that amount for the purchase of the government's interest. If no acceptable offer is received by the United States within six months from the date the Settlement Stipulation is approved by this Court, defendant Segal shall have the option to purchase the government's partnership interests with good funds at the appraised value set forth on Exhibit A within thirty days after the expiration of the six month period. No later than seven days prior to the expiration of the six month option period, defendant Segal shall notify the government of his intention to purchase the partnership interest, and shall provide good funds for the purchase of the government's interest in the partnership interest within ten days of the date of the notification.

The key sentence is the first: the grant to Segal of a "right of first refusal on a commercially reasonable, responsible cash offer made to the United States for the purchase of the government's ownership interest within six months of the approval of the [settlement]."

Within the six-month period the government received a $2.9 million offer for the Bulls investment from Peter Huizenga, a lawyer and wealthy investor who had been a founder of Waste Management Company. Segal didn't match Huizenga's offer, so he didn't get to repossess the other half of his original investment in the Bulls. He contends that the offer the government received from Huizenga was not a "commercially reasonable, responsible cash offer … [to] purchase" because it allowed the offeror to withdraw his offer

for any reason after the completion of due diligence. The government argued, and the district judge ruled, that the offer was commercially reasonable; but neither the district judge, nor the government either in the district court or in our court, gave more than perfunctory consideration to the issue of reasonableness.

A contract is a commitment, which if violated gives rise to a right to sue. An unconditional offer becomes a contract as soon as it's accepted. Many offers, however, are conditional. One might for example make an offer to buy a house conditional on being able to obtain a mortgage for a certain duration at a certain interest rate, to have the house inspected for termites, to inspect for liens, to have the sturdiness of the construction checked, and so forth. That offer, with all its conditions, would if made in good faith nevertheless be "commercially reasonable," as the offeree would understand that he'd have a deal were the conditions fulfilled. Huizenga's offer, however, did not have a finite number of conditions; it preserved his "sole and absolute discretion" to withdraw the offer for any reason.

Segal hints that in requiring that the offer be "acceptable," paragraph 9(f) of the settlement agreement required that the offer had to be capable of being accepted by the government, thus forming a contract. But the natural meaning of "acceptable" in this context is that the offer, since it did not bind the offeror, would have to be an acceptable basis for negotiations—for example by specifying a reasonable price that the government would have to consider as the parties began to negotiate the terms of the contract. Huizenga's offer was acceptable in that limited sense even though

it did not commit him to purchase the investment in the Bulls.

What casts the offer's commercial reasonableness into serious question begins with the fact that the Bulls are privately owned and that before the purchase could be completed a prospective purchaser of an investment in the Bulls (the offeror, in other words—Huizenga) would need both to dig for information about the franchise and to obtain the approval of both Jerry Reinsdorf (the Bulls' majority owner and managing partner) and the National Basketball Association, to become a partner in the Bulls enterprise (which Huizenga wanted to become). The government had only six months after the approval of the settlement agreement within which to obtain a commercially reasonable offer. Huizenga could have made his offer conditional on receiving the approvals he wanted rather than reserving the right to withdraw the offer for any (or for that matter for no) reason. Such an offer would have been commercially reasonable. But he refused to commit himself.

When the offer was made, the government sent a copy to Reinsdorf, and that kicked off negotiations with Huizenga. But after extensive negotiations involving the NBA, Reinsdorf decided not to allow Huizenga, despite the investment in the Bulls that he would be making, to become a full partner. As a result, Huizenga withdrew his offer.

As we said in *Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1229 (7th Cir. 1995), "the recipient of a hopelessly vague offer should know that it was not intended to be an offer that could be made legally enforceable by being accepted." That doesn't make such an offer commercially unreasonable; our home-buying example

shows that contingent offers can be commercially reasonable. The problem in this case is the impact of Huizenga's highly tentative offer on Segal's legitimate interests. According to the government and the district judge, to repossess his original half-interest in his Bulls investment pursuant to paragraph 9(f) of the settlement agreement Segal had to meet Huizenga's offer without knowing whether it was realistic. Huizenga was offering $2.9 million for an investment that had been appraised at only $2.09 million, and Segal argues that because Huizenga's offer had been withdrawn he (that is, Segal) should have been allowed to purchase the investment at the appraised value. For he had notified the government of his intent to purchase it before the government had received Huizenga's offer and more than seven days before the expiration of the six-month option granted Segal by the settlement.

True, Segal could purchase the investment at the appraised value only if no acceptable offer had been received by the government within six months, and Huizenga's offer made the deadline. But what was acceptable to the government could be unreasonable because of the impact on another party, namely Segal. Because Huizenga's offer was not binding and might therefore have been inflated—intended as a gambit for opening negotiations and in any event dependent on what his review of the Bulls' financial information might reveal—Segal could have no confidence that $2.9 million was a realistic valuation; if it was excessive, then by exercising his right of first refusal Segal would have found himself having overpaid for the investment. The form of Huizenga's offer forced Segal, the holder of the right of first refusal, to choose between paying what might be way too much and giving up his right of first refusal. He had no

firm ground on which to stand, given that Huizenga was free at any time to renege on his offer, as it was "intended as a statement of the intent of the parties and is not intended to be binding on any party. Any binding agreement with respect to this matter is subject to the negotiation of a mutually acceptable Definitive Agreement as set forth herein." Segal may also have reasonably interpreted paragraph 9(f) of the settlement agreement to conform to the usual practice, in the sale of professional sports teams, of prospective buyer and prospective seller to make a binding agreement conditional on approval by the league (the NFL in the case of football, the NBA in the case of basketball). See Beacon on the Hill Sports Marketing, "Investment Proposal Summary: Process for Buying an NFL Team, General Partnership or Limited Partnership Investment," www.beacononthehillsportsmark eting.com/pages/leaguesfranchises_nflinvestmentproposal.h tm; *Constitution and By-Laws of The National Basketball Association*, Article 5, pp. 8–9, May 29, 2012, http:mediacent ral.nba.com/media/mediacentral/NBA-Constitution-and-By-Laws.pdf (both websites visited January 20, 2016).

Segal was authorized to purchase the Bulls investment at the appraised value "if no acceptable offer [wa]s received by the United States within six months," and that appears to have been the case. The offer was acceptable to the government, but to be acceptable to Segal, an interested party, it would have had to be a *firm* offer—a reliable estimate of the market price of the Bulls investment formerly owned by Segal that would enable him to determine whether to pay that price. The expectation was disrupted by Huizenga's offer, which the district court should therefore have rejected. The district court must allow Segal to exercise with all delib-

erate speed his option to repurchase the remaining half of his interest in the Bulls for the appraised value.

So much for Segal's appeals. The government's appeal relates to another asset that the government retained as part of Segal's criminal punishment—stock, worth about $467,000, in the Rush Oak Corporation, a bank holding company. The government claims that the parties agreed as part of the settlement that the United States would keep the stock in order to satisfy the forfeiture judgment. Paragraph 12 of the settlement agreement states:

> All parties agree that upon approval of the Settlement Stipulation by the Court, the personal judgment in the amount of $15 million entered against defendant Segal shall be satisfied and the United States shall have no further claim against defendant Segal relating to the entry of the forfeiture judgment against him personally. Upon entry of a final order of forfeiture against the remaining property identified on Exhibit A, but not listed on Exhibit B, all right, title, and ownership interest in that remaining property shall vest in the United States and no one, including defendant Michael Segal, shall have any further claim to the property.

Thus the government would keep the assets that were listed on Exhibit A but not those listed on Exhibit B; those Segal would keep. But there's a problem: the Rush Oak stock is not listed on either exhibit.

Upon approval of the settlement agreement the $15 million forfeiture judgment against Segal was satisfied and Segal moved to have the Rush Oak stock released to him on that ground. But the government presented evidence that in the negotiations leading up to the settlement agreement the

early versions of Exhibit A listed Rush Oak, but Exhibit B never listed it. The assistant U.S. attorney who was handling this part of the government's case handed Segal's lawyer a draft he had prepared of Exhibit B—and it did not include the Rush Oak stock. Subsequent drafts excluded the stock from both lists.

While there was no discussion of the Rush Oak stock during the settlement negotiations, there were explicit negotiations about the Oak Bank stock, and Segal claims that the government's agreement to release the Oak Bank stock also covered the stock of Rush Oak, the holding company for Oak Bank. But the government presented evidence that the two types of stock had always been mentioned separately on the asset schedules. And the government had said it was agreeing to release the Oak Bank stock because it was worth only about $20,000; this estimate could not have included the Rush Oak stock, valued at $467,000.

The district judge held a hearing on whether to release the Rush Oak stock to Segal, and noting the absence of the stock from Exhibit A ruled that Segal was entitled to it. But in so ruling he overlooked the possibility that the asset had been inadvertently omitted from both lists.

The government asked that Segal's lawyer be called as a witness. The judge refused lest that "start getting into attorney-client privilege matters." No it wouldn't. The government wasn't asking to question the lawyer about confidential discussions with his client but only about whether the lawyer had seen the Rush Oak stock on the first version of Exhibit A, signifying that the government would retain it, and had noticed the omission on later versions but had not brought that to the court's attention.

The evidence points to a mutual mistake of fact—both parties assumed the stock would be retained by the government but in the rush of drafting and redrafting of the settlement agreement had failed to mention it. The fact that the stock was left off both exhibits suggests that that particular asset (hardly a giant) was simply forgotten. There is no evidence that it was meant to be on Exhibit B, the list of assets to be returned to Segal. But the government properly argues that an evidentiary hearing, which the district judge did not hold, is necessary to resolve the issue.

To summarize, we affirm the district judge's ruling with respect to the insurance policies, but reverse his ruling with respect both to the Bulls investment and the Rush Oak stock and remand with directions to allow Segal to buy the Bulls investment at its appraised value and to conduct an evidentiary hearing of the government's appeal regarding Rush Oak. The judgment entered by the district court is therefore AFFIRMED in part and REVERSED in part, and the case REMANDED with instructions.